**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KELLY MATHENEY,                                  No. C 06-3965 MHP (pr)

        Petitioner,                          **ORDER DENYING HABEAS
                                                  PETITION**

    v.

A. P. KANE, warden,

        Respondent.
_____/

**INTRODUCTION**

     Kelly Matheney, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now before the court for consideration of the merits of the pro se habeas petition.  For the reasons discussed below, the petition will be denied.

**BACKGROUND**

     Matheney was convicted in Los Angeles County Superior Court of second degree murder and was found to have used a firearm in the offense.  On August 25, 1993, he was sentenced to a total of 18 years to life in prison.  His habeas petition does not challenge his conviction but instead challenges an April 28, 2004 decision of the Board of Prison Terms, now known as the Board of Parole Hearings ("BPH"), that found him not suitable for parole. The hearing was his initial parole hearing, and was conducted at a time when he was 11 years into his 18-to-life sentence.

     The BPH identified the circumstances of the commitment offense, Matheney's prior criminal history, his prison behavior, an unfavorable psychological report, his inadequate parole plans, and his need for further participation in self-help programming as the reasons

1  for its decision that his release would pose an unreasonable risk of danger to society or threat

2  to public safety.  The BPH also relied on the opposition to parole by the district attorney's

3  office.

4      Matheney sought relief in the California courts.  The Los Angeles County Superior

5  Court denied his petition for writ of habeas corpus in a short, but reasoned, decision.  The

6  California Supreme Court summarily denied his petition for writ of habeas corpus.

7      Matheney then filed his federal petition for a writ of habeas corpus.  The court found

8  cognizable his claims that (1) his right to due process was violated because the evidence was

9  insufficient to support the BPH's decision that he was unsuitable for parole and (2) the BPH's

10  decision violated his plea agreement.  Respondent filed an answer and Matheney filed a

11  traverse.

12      The court earlier indicated that it intended to wait for guidance from the anticipated en

13  banc decision in Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527

14  F.3d 797 (9th Cir. 2008).  Although much time has passed, Hayward remains pending in the

15  appellate court and it is unknown to this court when the decision will be released.  The court

16  will proceed to decide the merits of the petition without the benefit of the Hayward decision.

17                    **JURISDICTION AND VENUE**

18      This court has subject matter jurisdiction over this habeas action for relief under 28

19  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

20  action concerns the execution of the sentence of a prisoner housed at a prison in Monterey

21  County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

22                          **EXHAUSTION**

23      Prisoners in state custody who wish to challenge collaterally in federal habeas

24  proceedings either the fact or length of their confinement are required first to exhaust state

25  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

26  highest state court available with a fair opportunity to rule on the merits of each and every

27  claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not

28  dispute that state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.   Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and

3

assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129. As a matter of state law, the parole authority's decision must also satisfy the "some evidence" standard of review. See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous").

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

B.    State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a minimum term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime.  The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a).

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness."  Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[2]

A critical issue in parole denial cases concerns the parole authority's use of evidence about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts

for applying the <u>Superintendent v. Hill</u> some evidence standard on this point: <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, and <u>Irons v. Carey</u>, 505 F.3d 846 (9th Cir. 2007).[3]  <u>Biggs</u> explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  <u>Biggs</u>, 334 F.3d at 916-17.  <u>Biggs</u> upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  <u>Id.</u> at 916.  Next came <u>Sass</u>, which criticized the <u>Biggs</u> statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."  <u>Sass</u>, 461 F.3d at 1129.  <u>Sass</u> determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability.  <u>See</u> <u>id.</u> (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  <u>Sass</u> also put to rest any idea from <u>Biggs</u> that the commitment crime and pre-offense behavior only support the initial denial of parole.  <u>Irons</u> determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence.  <u>Irons</u> emphasized that all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."  <u>Irons</u>, 505 F.3d at 853.  Interpreting this statement from <u>Irons</u> to suggest that the

1   offense can only be relied on until the minimum number of years has been reached would

2   suffer the same problem that <u>Sass</u> identified in <u>Biggs</u>: it is not the holding of the case.  The

3   dicta in <u>Biggs</u> and <u>Irons</u> are speculative and do not determine when a denial of parole based

4   solely upon the commitment offense or pre-offense behavior violates due process.  Neither

5   logic nor <u>Irons</u> compel a decision that such reliance must cease when the prisoner reaches the

6   minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

7        The upshot of these three cases is that the BPH can look at immutable events, such as

8   the nature of the conviction offense and pre-conviction criminality, to predict that the

9   prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight

10  to be attributed to those immutable events should decrease over time as a predictor of future

11  dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and

12  <u>Irons</u>).  <u>Sass</u> did not dispute the principle that, other things being equal, a murder committed

13  50 years ago is less probative of a prisoner's current dangerousness than one committed 10

14  years ago.  Not only does the passage of time in prison count for something, exemplary

15  behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>.

16  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u>

17  be arbitrary, and reliance on only the facts of the crime might eventually make for an

18  arbitrary decision.[4]

19  C.   <u>Some Evidence Supports The BPH's Decision In Matheney's Case</u>

20       1.   <u>BPH Decision</u>

21        The BPH identified the circumstances of the commitment offense, Matheney's prior

22  criminal history, his prison behavior, an unfavorable psychological report, his inadequate

23  parole plans, and his need for further participation in self-help programming as the reasons

24  for its decision that his release would pose an unreasonable risk of danger to society or threat

25  to public safety.  The BPH also relied on the opposition to parole by the district attorney's

26  office.  In its decision, the BPH noted that there were some good points for Matheney, e.g.,

27  that he had been enrolled in a local college independent study program, that he had not

28  received any disciplinary write-ups for five years, that he had excellent work reports and

7

laudatory chronos for several years.  Nonetheless, the positive aspects of his behavior did not outweigh the factors of unsuitability, in the BPH's view.

a.      Commitment Offense

In finding Matheney unsuitable, the BPH stated that the commitment offense "was carried out in a manner which demonstrates a callous disregard for human life.  The offense was carried out in an especially violent and brutal manner.  And the offense was carried out in a dispassionate manner."  RT 67.  The circumstances of the commitment offense could be considered as tending to indicate unsuitability.  See 15 Cal. Code Regs. § 2402(c)(1).

Matheney shot the victim in the back with an 18-inch pistol-grip shotgun.  The BPH relied on the probation officer's report that described the circumstances surrounding the crime.

> The defendant came to the attention of a witness in Palmdale, when the defendant drove up in his motor vehicle, and inquired of that witness as to the whereabouts of victim Brian Stockberger.  Apparently Mr. Stockberger had lived in that neighborhood at one time.  The witness knew the victim, and telephoned the victim stating that the defendant was inquiring as to his whereabouts.  The witness then put the defendant on the phone with Mr. Stockberger.  Defendant was observed to be writing down some directions, hung up and then left.
>
> The witness, feeling that something was wrong, phoned the victim, and stated that when the defendant got there, the victim was to call him and tell him whether everything was alright.  When the witness never heard from the victim, and after calling the victim and receiving no answer, the witness went to the victim's house but the victim was dead and the sheriffs were already there.
>
> Other witnesses in the neighborhood indicated that they heard a gunshot, and observed the defendant to flee the scene, jump in his vehicle and leave.  They also observed the victim to fall down by the doorway of his house.
>
> Sheriff's deputies and paramedics determined that the victim had suffered a shotgun wound in the back.  The coroner's report was later to indicate that it had entered the back and went through a vertebrae and damaged other vital parts.

Resp. Exh. 2 at 2-3.  Matheney turned himself in at a police station the next day.  Matheney's brother stated that Matheney had told him (i.e., the brother) that he went to the victim's home to sell him a shotgun, got into an argument with the victim, and Matheney had tried to grab the shotgun and it went off.  Id. at 3.

At the parole hearing, Matheney stated that he went to see the victim to sell him the shotgun, the victim acted strangely when Matheney arrived, that the victim "rushed me for

8

the gun, and I backed up with the gun, backed up right against the wall.  As he went by me the shotgun went off, just that simple." RT 17.  Matheney had consumed about a quart of vodka before the noontime shooting.

The BPH panel did not appear to believe Matheney's version of an accidental discharge of the gun.  The BPH appeared to consider these points to show the story was of dubious verity: Matheney did not know the current address of the person who was supposed to be buying a gun from him; the neighbor in the old neighborhood who put him in touch with the victim was concerned enough to want the victim to check in after Matheney arrived to let him know everything was okay; that same neighbor was concerned enough to drive to the victim's house to check up on him when he was unable to reach him after Matheney left to go to the victim's house; Matheney did not know whether he had made arrangements to sell the gun before he went to the victim's house; the shotgun was loaded (although Matheney said it was for protection due to earlier riots in Los Angeles); Matheney's desire to sell the gun seemed inconsistent with his story that he carried it loaded for protection after the riots; Matheney's current statement that the victim acted strangely when he arrived and charged at him was different from that in the probation officer's report; he fled the scene; and, most importantly, the victim had been shot in the back.  See RT 15-23, 55-58, 67-68.

b.    Prior Criminal Record

The BPH stated that it also relied on Matheney's prior criminal record in denying him parole.  RT 68.  Matheney had a short criminal record.  He had been arrested in 1990 for assault with a deadly weapon but charges were never filed.  According to Matheney, this arrest was based on a bar fight started by another person who insulted his wife and then escalated into a brawl, during the course of which Matheney retrieved a chain from his car and hit one of the persons who he stated was attacking him.  See RT 24-25.  Matheney also had a conviction in 1989 for driving under the influence of alcohol, for which he received a 5-year probation term.  See Resp. Exh. 2 at 5.

9

1                           c.       Prison Behavior

2          The BPH rested its decision in part on Matheney's limited programming while

3    incarcerated.  RT 68-69, 71.  He had failed to develop a marketable skill in prison that could

4    be put to use upon release and had failed to upgrade vocationally.   There was some

5    evidentiary support for this. Matheney had not completed a trade program within the

6    institution, although before his incarceration he was an experienced repairman for sewing

7    machines office machines, and vacuums.  RT 29-30.

8          The BPH also noted that he had not engaged in sufficient beneficial self-help.  RT 68.

9    Matheney had been in Alcoholics Anonymous or Narcotics Anonymous in 1998 and 1999,

10   but had not participated since then until the night before the parole hearing in 2004.  RT 29,

11   33, 35, 51-53.  He stated that AA meetings were not available for some of the 1999-2004

12   time period.

13         The BPH also noted that Matheney had some misconduct in prison.  RT 68-69.  He

14   had received two CDC-115 rule violation reports: one in 1996 for failure to account for tools

15   at a job site, and another in 1999 for refusal to work.  See 30-31, 37.  He also had received

16   five CDC-128 counseling memoranda for lesser transgressions of prison rules.  RT 37.

17                          d.       Psychological Report

18         The BPH also relied in part on the lukewarm psychological evaluation.  RT 68.  The

19   psychological report from November 2003 had an "assessment of dangerousness" section

20   that stated that, "'[i]f released to the community, his violence potential is considered to be

21   slightly more than the average citizen in the community.'" RT 44.  The risk factors for this

22   prisoner were any return to drug or alcohol abuse.  Matheney disagreed with the assessment

23   of dangerousness.  RT 45-46.

24                          e.       Need For Further Self-Help Programming

25         The BPH stated in its decision that Matheney needed "to participate in self-help in

26   order to face, discuss, understand and cope with stress in [a] nondestructive manner.  Until

27   progress is made the prisoner continues to be unpredictable and a threat to others."  RT 69.

28   It is unclear whether this statement was made because the BPH did not believe his story that

                                           10

the shooting was accidental, or because he had an alcohol abuse problem, or both.

As noted in section C.1.a., the BPH did not appear to believe the shooting was an accident.  If the BPH's disbelief led it to determine that Matheney needed further self-help, there was sufficient support in the record for that disbelief.

If the BPH believed that further self-help programming was needed to deal with his alcoholism, there was evidence in the record to support that belief.  Matheney was an alcoholic and had been drinking on the day of the killing.  According to the probation officer's report, Matheney had stated that "he had been using Valiums which he purchased 'off the street' for the past six years.  It was sort of a self-treatment for alcoholism."  Resp. Exh. 2 at 6.  He also had reported to the probation officer that he had bouts of paranoia.  RT 54-55.  At the parole hearing, Matheney stated that he had exaggerated his problems for the probation officer and criminal court, see RT 55, 59.

> f.   Parole Plans

The BPH also stated that Matheney's parole plans were unrealistic in that he did not have a job offer.  RT 69.  Although he did not have a job offer, he did have marketable skills in a limited market in that he was an experienced vacuum and sewing machine repairman before he went to prison.  There was limited evidentiary support for the BPH's reliance on this factor, even if there was mixed evidence on it.

The BPH also noted that the district attorney opposed parole.  See RT 69.  The district attorney and victims are allowed to speak and the BPH is allowed by state law to consider their input in making its decision.  The fact that relatives or the district attorney opposes parole is not inherently probative of an inmate's current danger.  However, the input sometimes does contain information that may be of value in the parole consideration.

> 2.   State Court Decision

The Los Angeles County Superior Court rejected Matheney's habeas petition in a short, but reasoned, decision.  Resp. Exh. 4.  The court noted that the Board found Matheney unsuitable because of the circumstances of the commitment offense, his prior criminal conduct, his failure to sufficiently participate in beneficial self-help, his serious misconduct

11

1   while incarcerated, and his unrealistic parole plans.  The court independently reviewed the

2   record, giving deference to the broad discretion of the parole board, and concluded "that the

3   record contains 'some evidence' to support the Board's finding that Petitioner is unsuitable for

4   parole."  Id. at 2.

5          3.      Analysis Of Federal Claim

6          This court applies § 2254(d) to the Los Angeles County Superior Court's decision

7   because it is the last reasoned decision from a state court on Matheney's claim.  See Ylst v.

8   Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th

9   Cir. 2005).  The superior court correctly identified the "some evidence" standard as the

10  applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29

11  Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v. Hill some

12  evidence standard as the proper standard for judicial review of evidentiary sufficiency for

13  administrative cases.  See Rosenkrantz, 29 Cal. 4th at 665-67.

14         The superior court did not unreasonably apply Superintendent v. Hill in determining

15  that there was some evidence to support the BPH's decision.  Notwithstanding limited

16  positive factors for Matheney, the BPH had determined that, 11 years into his 18-to-life

17  sentence, Matheney posed an unreasonable risk of danger to society if released from prison

18  because of the murder plus his short criminal record, his prison misconduct, his limited

19  programming in prison, the unfavorable psychological report, and his need for further self-

20  help programming.  There is a rational connection between the evidence relied on and the

21  decision that he is a current threat.  Shooting someone in the back with a pistol grip shotgun

22  is a callous act and is a murder carried out in a dispassionate manner.  His assertion that it

23  was an accidental shooting is not one that the BPH or this court is required to accept,

24  especially since it is inconsistent with the conviction and appears inconsistent with the fact

25  that the victim was shot in the back.  Although the murder was obviously a very large factor

26  in its decision, the BPH did not rely solely on the murder and instead properly relied on the

27  murder plus a combination of several other factors.  See 15 Cal. Code Regs. § 2402(b)

28  ("Circumstances which taken alone may not firmly establish unsuitability for parole may

12

1   contribute to a pattern which results in a finding of unsuitability.")  The BPH appeared

2   especially concerned about the fact that Matheney had not been in AA for about five years,

3   which reasonably would prompt a concern about a return to alcohol abuse if paroled for this

4   inmate who admittedly had an alcohol abuse problem before incarceration.  Bearing in mind

5   that the court's chore is to consider not whether some evidence supports the reasons, but

6   whether some evidence supports the conclusion that Matheney's release unreasonably

7   endangers public safety, this court concludes that the Los Angeles County Superior Court's

8   rejection of his insufficient evidence claim was not contrary to or an unreasonable

9   application of the Superintendent v. Hill some evidence standard.

10  D.      Breach Of Plea Agreement Claim

11         Matheney contends that the BPH's decision to find him not suitable for parole violated

12  his plea agreement.  He identifies Exhibit B to his petition as the "contract," but that

13  document is plainly not a contract.  Exhibit B consists of the minutes for superior court

14  proceedings on August 24, 1993.  The minutes have no promises, and simply reflect that in

15  the middle of a trial, Matheney pled guilty to second degree murder and admitted the

16  enhancement allegation under California Penal Code § 12022.5(a) for use of a firearm.  The

17  sentence imposed was the "term prescribed by law" of "15 yrs to life," plus 3 years for the

18  enhancement.  Petition, Exh. B at 2.

19         To the extent he wants to contend that Exhibit B reflects a contract he entered, that

20  would not help him because he has not identified any term that has been breached.   "Plea

21  agreements are contractual in nature and are measured by contract law standards." Brown v.

22  Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting  United States v. De la Fuente, 8 F.3d

23  1333, 1337 (9th Cir. 1993)).  Although a criminal defendant has a due process right to

24  enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S. 257, 261-62

25  (1971), there is no evidence that expectations about how parole would be decided were part

26  of the plea agreement.

27         Matheney seems to include in his argument a suggestion  that the matrix is part of a

28  contract that sets the maximum term of his imprisonment.  This argument fails because,

1   among other things, the prisoner must be found suitable for parole before the matrix is

2   consulted to set a term for that prisoner, as explained in section "B" above.  Matheney has

3   not been found suitable, so the time to consult the matrix has not arrived.

4          The state court's rejection of the plea bargain claim was not contrary to, or an

5   unreasonable application of, clearly established Supreme Court authority.  Matheney's claim

6   that his plea agreement was breached in violation of his right to due process fails.

7                                          **CONCLUSION**

8          For the foregoing reasons, the petition is denied on the merits.  The clerk shall close

9   the file.

10         IT IS SO ORDERED.

11  DATED: March 23, 2010                    _____

12                                           Marilyn Hall Patel
                                             United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

# NOTES

1.    The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).

2.    The California Supreme Court's determination in <u>Lawrence</u>, 44 Cal. 4th 1181, that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action.  <u>See</u> <u>Hicks v. Feiock</u>, 485 U.S. 624, 629-30 (1988).  However, <u>Lawrence</u> does not govern this court's analysis in every respect.  This court is not bound by the discussion in <u>Lawrence</u> (<u>see</u> footnote 4, <u>infra</u>) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous.  As to that point, <u>Lawrence</u> is persuasive authority, while the Ninth Circuit's holdings in <u>Sass</u>, <u>Biggs</u>, and <u>Irons</u> are binding authority.  Also, <u>Lawrence</u>'s determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

3.    <u>En banc</u> review is now pending in a fourth case regarding the some evidence standard, <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), <u>reh'g en banc granted</u>, 527 F.3d 797 (9th Cir. 2008).  The order granting <u>en banc</u> review states that the panel opinion is of no precedential value.

4.    The California Supreme Court discussed the use of the commitment crime to deny parole in the companion cases of <u>Lawrence</u>, 44 Cal. 4th 1181, and <u>In re Shaputis</u>, 44 Cal. 4th 1241 (Cal. 2008).  The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' <u>inevitably</u> supporting the ultimate decision that the inmate remains a threat to public safety."  <u>Lawrence</u>, 44 Cal. 4th at 1191 (emphasis in source).  Applying that rule, the court determined that there was not some evidence to deny parole in <u>Lawrence</u> but that there was some evidence to deny parole in <u>Shaputis</u>.